IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Better Bets Ventures, LLC, | : | |
| Petitioner | : | **CASES CONSOLIDATED** |
| | : | |
| v. | : | |
| | : | |
| Pennsylvania Gaming Control Board, | : | |
| | : | |
| Respondent | : | No. 386 C.D. 2022 |
| | : | |
| Michael Brozzetti, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Pennsylvania Gaming Control Board, | : | |
| | : | |
| Respondent | : | No. 387 C.D. 2022 |
| | : | |
| Frank Brozzetti, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Pennsylvania Gaming Control Board, | : | |
| | : | |
| Respondent | : | No. 388 C.D. 2022 |
| | : | |
| Lendell Gaming, LLC, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Pennsylvania Gaming Control Board, | : | |
| | : | |
| Respondent | : | No. 389 C.D. 2022 |

Richard Teitelbaum,                       :
                    Petitioner             :
                                          :
          v.                              :
                                          :
Pennsylvania Gaming Control               :
Board,                                    :
                    Respondent             :        No. 390 C.D. 2022
                                          :
                                          :        Argued: September 11, 2023

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION
BY JUDGE McCULLOUGH                                FILED: October 12, 2023

          In these consolidated appeals, Petitioners Better Bets Ventures, LLC
(Better Bets), Michael Brozzetti and Frank Brozzetti, Jr. (together, the Brozzettis),
Lendell Gaming, LLC (Lendell Gaming), and Richard Teitelbaum (Teitelbaum)
(collectively, Petitioners or Applicants) seek review of the Pennsylvania Gaming
Control Board's (Board) orders and Corrected Adjudication issued on March 23, 2022,
and March 24, 2022, respectively.  Therein, the Board denied Petitioners' several
applications (Applications) for both video gaming terminal operator (Better Bets and
Lendell) and video gaming terminal principal (Teitelbaum and the Brozzettis) licenses
pursuant to the act relating to video gaming terminals, also commonly known as the
Video Gaming Act.[1]  The Board denied the Applications, in essence, because of
Petitioners' involvement in and association with the "skill games" industry in
Pennsylvania.  On appeal, Petitioners argue that the Board committed legal error and
abused its discretion in denying the Applications on that basis.  After careful review,
we agree.  We accordingly reverse the Board.

_____
          [1] 4 Pa. C.S. §§ 3101-4506.

2

# I. FACTS AND PROCEDURAL HISTORY

The facts material to the issues presented in these appeals are not disputed. The Board made extensive findings of fact in its Corrected Adjudication, a large portion of which was based on stipulations of fact submitted by the parties. *See* Reproduced Record (R.R.) at 80a, 594a. We summarize the Board's pertinent findings as follows.[2]

## A. Teitelbaum and Lendell Gaming

Teitelbaum is the sole owner, corporate officer, and decision-maker of Lendell Gaming, a Pennsylvania limited liability company. Teitelbaum also is the sole owner, corporate officer, and decision-maker of Lendell Vending, Inc., a Pennsylvania Corporation formed in 2003 (Lendell Vending).[3] Lendell Vending operates amusement equipment, automated teller machines, and jukeboxes in Pennsylvania and New Jersey. Teitelbaum first became aware of "skill games"[4] in 2015 when he was approached by Lou Miele, the owner of Miele Manufacturing, Inc. (Miele), which manufactures skill games for vending companies. Miele provided to Teitelbaum a copy of the Beaver County Court of Common Pleas decision in *In re Pace-O-Matic, Inc. Equipment I.D. No. 142613* (Pa. C.P., Beaver Cnty., No. M.D. 965-2013, filed December 23, 2014) (*Beaver County Case*), which held that a skill game manufactured

---

[2] Where noted, we have supplemented the Board's findings of fact with additional necessary facts from the Reproduced Record.

[3] Although Teitelbaum is the principal of both Lendell Gaming and Lendell Vending, for the sake of clarity, we note initially that Lendell Vending did not submit any of the Applications at issue in this appeal. Lendell Vending is not, and has never been, a party to these proceedings.

[4] We utilize the term "skill games" to describe the games referenced throughout the Board's Corrected Adjudication and the parties' briefs as "Pennsylvania Skill" or "skill-based" games. In utilizing the term "skill games," we render no findings or conclusions regarding the nature of these games as either predominantly skill- or chance-based. We are cognizant of other litigation pending in this Court in which that very determination is at issue, and nothing herein should be construed as the Court's inclination toward one characterization or the other.

3

by Miele, branded as "Pennsylvania Skill," was not an illegal gambling device subject to forfeiture. *See* R.R. at 963a-75a. Miele also provided Teitelbaum with a copy of testimony given by Major Thomas Butler, the Director of the Pennsylvania State Police Bureau of Liquor Control Enforcement (BLCE), before the Pennsylvania House of Representatives regarding skill games, their distribution throughout the Commonwealth, and BLCE's decision not to take action against skill game operators given the current state of Pennsylvania law.

In 2016, Teitelbaum, through Lendell Vending, began purchasing skill games from Miele and offering them to customers. Teitelbaum purchased and marketed only the brand of "Pennsylvania Skill" games found to be legal in the *Beaver County Case*. In August 2018, Lendell Gaming applied for a video gaming terminal operator license, and Teitelbaum applied for an associated video gaming terminal principal license. In October 2018, during the investigation conducted by the Board's Bureau of Investigations and Enforcement (BIE),[5] the Board issued Lendell Gaming and Teitelbaum conditional licenses. BIE confirmed with Teitelbaum that he operated skill games and requested a list of the names of Teitelbaum's skill games and their locations, which Teitelbaum provided.

On June 10, 2019, the Pennsylvania House of Representatives Gaming Oversight Committee conducted a hearing on electronic gambling devices, at which Major Scott T. Miller, then-director of BLCE, and Drew Svitko, the Executive Director of the Pennsylvania Lottery (Lottery), testified regarding the problems they believed skill games posed in Pennsylvania. Major Miller testified that skill games do not have

---

[5] The BIE is established by Section 1517(a) of the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa. C.S. § 1517(a), and investigates (1) applications for licenses, permits, and registrations, and (2) alleged violations of the Gaming Act. *DeNaples v. Pennsylvania Gaming Control Board*, 178 A.3d 262, 263 (Pa. Cmwlth. 2018).

4

controls in place to prevent underage gambling like those that are in place at casinos. He further testified that proceeds from skill games typically are paid to owners in cash, and, because they are unregulated, the games do not have payout requirements like slot machines at licensed facilities.

Mr. Svitko gave his opinion regarding the negative impact that skill games have had on the Lottery. Specifically, he testified that (1) skill games cause an annual loss of $138 million that otherwise would be spent on programs and services for senior citizens; (2) skill games are video gambling machines; (3) skill games often resemble Lottery machines and are placed near Lottery machines in establishments to give the impression that they are a sanctioned Lottery game; and (4) if skill games remain in competition with the Lottery, such competition could result in hundreds of millions of dollars in future lost Lottery revenue. Both Major Miller and Mr. Svitko testified that skill games are illegal in Pennsylvania.

On June 12, 2019, BLCE notified Teitelbaum and other liquor licensees that skill games are illegal and that their operation would result in citations against their liquor licenses. As of July 1, 2019, Lendell Vending had provided 211 "Pennsylvania Skill" games to 125 businesses in Pennsylvania. On February 27, 2020, the Board's Office of Enforcement Counsel (OEC) sent Lendell Gaming and Teitelbaum's counsel a Notice of Recommendation of Denial of Initial Application (Lendell Denial Notice) indicating that OEC would recommend to the Board that their license Applications be denied. In pertinent part, the Lendell Denial Notice advised as follows:

> Please be advised that [OEC] is of the opinion that these [skill games] are unlicensed and unregulated video gaming terminals and/or slot machines, skilled slot machines, or hybrid slot machines that have not been approved by the Board for manufacturing or distribution in Pennsylvania. As a result of the unapproved distribution of these unlicensed and unregulated video gaming terminals and/or [s]lot [m]achines

5

by [ ] Teitelbaum, through Lendell Vending, [OEC] is of the opinion that [ ] Teitelbaum and/or Lendell Gaming have failed to meet the character requirements pursuant to 4 Pa. C.S. § 3502(b) and (f) and/or the overall suitability requirements of a principal applicant and/or terminal operator applicant.

. . . .

[OEC] is of the opinion that by providing, and continuing to provide, these unlicensed and unregulated video gaming terminals and/or [s]lot [m]achines, without Board authorization and proper licensure, [ ] Teitelbaum has violated the Video Gaming Act, the Gaming Act, and the Board's regulations. . . .

. . . .

[OEC] is also of the opinion that these violations of the Video Gaming Act, the Gaming Act, and the Board's regulations, along with the underlying facts[,] demonstrate that [ ] Teitelbaum does not possess the requisite good character, honesty, and integrity required by the Video Gaming Act, and is therefore not suitable for a [v]ideo [g]aming [t]erminal [p]rincipal [l]icense. [OEC] holds the position that unregulated, untested, and unapproved video gaming terminals and/or [s]lot [m]achines pose a threat to the public interest and the effective regulation and control of video gaming operations. Therefore, it is in the public interest to deny video gaming terminal applications in such cases. As such, [OEC] is **OBJECTING** to [ ] Teitelbaum's [A]pplication for a [v]ideo [g]aming [t]erminal [p]rincipal [l]icense and recommending that the Board **DENY** [ ] Teitelbaum's [A]pplication.

. . . .

[OEC] is of the opinion that denial of [ ] Teitelbaum's application for a [v]ideo [g]aming [t]erminal [p]rincipal [l]icense and Lendell Gaming's application for a [v]ideo [g]aming [t]erminal [o]perator [l]icense is consistent with the requirements of the Video Gaming Act and the Board's regulations and is overall in the public interest. . . .

6

(R.R. at 13a-18a) (emphasis in original).

## B. Better Bets and the Brozzettis

Better Bets is a limited liability company based in Moscow, Pennsylvania. The Brozzettis each own a 50% interest in Better Bets. The Brozzettis also each own a 33.33% interest in another business, Hugo Amusements, LLC (Hugo). Their father, Frank Brozzetti, Sr., owns the remainder of Hugo. Since 2015, Hugo has been in the business of providing skill games to Pennsylvania businesses and, as of July 16, 2020, had provided 155 skill games to 86 businesses in the Commonwealth. Included among the skill games provided to businesses by Hugo are the "Diamond Choice Skill Game 1" and "Diamond Choice Skill Game 2" games (Diamond Choice Games). On March 23, 2017, the Luzerne County Court of Common Pleas held that the Diamond Choice Games were illegal gambling devices subject to forfeiture under Section 5513 of the Crimes Code, 18 Pa. C.S. § 5513 (*Luzerne County Case*).[6] (R.R. at 976a.)

On January 17, 2019, Better Bets submitted Applications for both a video gaming terminal operator license for itself and a video gaming terminal principal license on behalf of the Brozzettis. (R.R. at 31a.) In March 2019, the Board issued conditional licenses to both Better Bets and the Brozzettis, which conditional licenses were extended in June 2020. On August 19, 2020, OEC sent to Better Bets' and the Brozzettis' counsel a Notice of Recommendation of Denial of Initial Application for Video Gaming Terminal Operator License (Better Bets Denial Notice) (with Lendell Denial Notice, the Denial Notices). *Id.* In the Better Bets Denial Notice, OEC justified

---

[6] Section 5513(a) pertinently provides that a person who "intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift . . . any device to be used for gambling purposes, except playing cards," is guilty of a first-degree misdemeanor. 18 Pa. C.S. § 5513(a). *See also* 18 Pa. C.S. § 5513(b) ("Any gambling device possessed or used in violation of the provisions of subsection (a) shall be seized and forfeited to the Commonwealth.").

7

the recommended license denials on substantially the same grounds as those set forth in the Lendell Denial Notice. Specifically, OEC concluded that the Brozzettis, through Hugo, marketed "unregulated" and "unlicensed" skill games to businesses throughout Pennsylvania and, accordingly, failed to meet the character and suitability requirements of the Video Gaming Act. (R.R. at 33a.) OEC further concluded that, by marketing the skill games through Hugo, the Brozzettis also violated the Video Gaming Act, the Gaming Act, and the Board's regulations. (R.R. at 36a.) Additionally, OEC relied on the *Luzerne County Case* to conclude that the Brozzettis, through Hugo, violated the Crimes Code by distributing skill games. *Id.*

OEC finally advised that it "holds the position that unregulated, untested, and unapproved video gaming terminals and/or [s]lot [m]achines, as well as illegal gambling devices, pose a threat to the public interest," and, therefore, "it is in the public interest to deny these video gaming terminal applications." *Id.*[7]

## C.     **Proceedings Before the Board**

Petitioners requested hearings on their Applications, which were scheduled before a hearing officer from the Board's Office of Hearings and Appeals (OHA). The hearing on the Lendell Gaming and Teitelbaum Applications was held on April 28, 2021. Better Bets and the Brozzettis ultimately waived their right to a hearing and requested that the Board consider their Applications on stipulated facts. After hearing, oral argument, and consideration of the parties' briefs, the Board voted unanimously on March 23, 2022, to accept OEC's denial recommendations for all of the Applications. The Board issued an Adjudication on March 23, 2022, and a

---

[7] OEC concluded that, because the Brozzettis were the sole owners of Better Bets and majority owners of Hugo, this common ownership and control established that "Better Bets has a business association with Hugo." (R.R. at 37a.)

Corrected Adjudication on March 24, 2022, in which it provided the reasoning for its decision.

In its Corrected Adjudication, the Board rejected Petitioners' arguments that they had not been adequately advised by OEC that its denial recommendations would be based on its finding that granting the Applications would be contrary to the public interest. The Board concluded that the Denial Notices contained specific findings that denying the Applications would be in the public interest. (Corrected Adjudication at 25-26.) The Board also noted that, "[u]ltimately, the issue in these matters is whether [Petitioners'] ties or former ties to [skill games] support a finding that they lack the good character and integrity required for licensure," and, "regardless of the legality of [Petitioners'] conduct, should the Board determine that their actions are otherwise contrary to the public interest, this could also support such a finding." (Corrected Adjudication at 26.)

On the merits, the Board first concluded that, because the Brozzettis were part owners of Hugo, which distributed the Diamond Choice Games found to be illegal gambling devices in the *Luzerne County Case*, there was "substantial evidence" that Hugo operated illegal gambling devices in violation of the Crimes Code. The Board secondly concluded that, regardless of skill games' legality in the Commonwealth, their "offer for play and operation is contrary to the positions taken by various government agencies." *Id.* at 28. The Board relied on Major Miller's and Mr. Svitko's testimony presented before the Pennsylvania House of Representatives to conclude as follows regarding Petitioners' suitability for the issuance of video gaming terminal licenses:

(1) Regardless of skill games['] legality, their offer for play and operation is contrary to the positions taken by various government agencies, namely, BLCE and the Lottery.

9

(2) Skill games are not regulated and are not operated in a controlled environment, which makes regulation of underage and illegal gambling more difficult.

(3) Skill games do not have payout requirements.

(4) Skill games cause millions of dollars of revenue losses to the Lottery and often are positioned in establishments to look like sanctioned Lottery machines.

(5) BLCE considers skill games to be illegal and their operation may justify a citation against the liquor licenses of establishments where they are housed.

(6) Skill games do not contain any of the protections that are required for licensed gambling operations, including character and suitability requirements, protections against underage gambling, minimum payout requirements, and compulsive and problem gambling protections.

(Corrected Adjudication at 27-31.) The Board contrasted these protections with the fact that the operation of skill games is unregulated and therefore (1) does not provide any protections against problem and compulsive gambling; (2) will not necessarily self-regulate to guard against underage and problem gambling; (3) does not produce the same level of tax revenue as other regulated gambling operations, such as the Lottery; and (4) negatively impacts public confidence in, and the operation of, legalized gambling venues, especially casinos that house licensed slot machines. *Id.* at 31-36.

The Board ultimately concluded that Petitioners do not possess the character required for the issuance of video gaming terminal licenses, stating:

> Overall, the Board believes that gaming is best conducted in an environment that is strictly controlled and regulated. Such an environment requires surveillance and security measures, protections against underage gaming, protections against compulsive and problem gambling, the requiring of approved internal controls to safeguard assets, an overarching body of law to regulate the conduct, and a government agency to

10

oversee and enforce these protections. [Skill games] in unlicensed locations do not contain any of these protections. The Board, therefore, considers [skill games] to be a substantial public threat.

Collectively, the record shows that [Petitioners] are, or were, involved in an industry that possesses none of the oversight and public protection[s] required to ensure the integrity of their gaming operations. The Brozzettis' and Teitelbaum's continued involvement in this industry casts substantial doubt on whether they possess the good character and integrity required for a video gaming terminal principal license. Additionally, the suitability of the Brozzettis is further tarnished by their operation of [the Diamond Choice Games] that were determined to be illegal gambling devices by a Pennsylvania court. Consequently, the Board finds that [ ] Teitelbaum and the Brozzettis have failed to establish by clear and convincing evidence that they are suitable for licensure.

Since the principals of Better Bets [ ] and Lendell Gaming are unsuitable for a principal license, the Board must find that these entities are not eligible for video gaming terminal operator license[s].

*Id.* at 37. The Board accordingly adopted OEC's recommendations and denied Petitioners' Applications by orders filed March 23, 2022.[8] Petitioners thereafter filed separate petitions for review in this Court on April 21, 2022. We consolidated the several petitions for decision by order exited July 7, 2022.

## II.    ISSUES

Petitioners raise five issues on appeal, which we summarize as follows: (1) whether the Board's findings of fact and conclusions of law are supported by substantial evidence; (2) whether the Board erred and abused its discretion in

---

[8] The Board denied the Applications by orders filed March 23, 2022. (R.R. at 1387a-88a.) The Board issued an original Adjudication contemporaneously with its orders, *see* R.R. at 1389a-1427a, and subsequently issued the Corrected Adjudication on March 24, 2022.

concluding that Petitioners do not possess the "good character, honesty, and integrity" required for licensure; (3) whether the Board erred and abused its discretion in concluding that Better Bets and the Brozzettis operated illegal gambling devices in violation of 18 Pa. C.S. § 5513; (4) whether the Board erred and abused its discretion in concluding that granting Petitioners' Applications was contrary to the public interest; and (5) whether the Board erred and abused its discretion in concluding that the Board's Denial Notices comported with due process by sufficiently informing Petitioners of the reasons for OEC's recommendations.

### III.    SCOPE AND STANDARD OF REVIEW

Our scope review of a Board order is limited to determining whether the Board's necessary findings of fact are supported by substantial evidence and whether the Board committed legal error or violated constitutional rights. *DeNaples*, 178 A.3d at 267 n.1 (citing, *in part*, 2 Pa. C.S. § 704). Our review of questions of law is plenary, and an administrative agency's interpretation of an otherwise clear statute, including its own enabling statute, is not entitled to deference. *Crown Castle NG East LLC v. Pennsylvania Public Utility Commission*, 234 A.3d 665, 667-68, 679-80 (Pa. 2020). An administrative agency's adjudication is not in accordance with the law if it represents a manifest and flagrant abuse of the agency's discretion or a purely arbitrary execution of its duties or functions. *Slawek v. State Board of Medical Education & Licensure*, 586 A.2d 362, 365 (Pa. 1991). However, "[i]n the absence of bad faith, fraud, capricious action or abuse of power, reviewing courts will not inquire into the wisdom of the agency's action or into the details or manner of executing agency action." *Id.*

12

## IV. DISCUSSION

### A. Pertinent Provisions of the Video Gaming Act

Section 3301 of the Video Gaming Act defines the Board's powers to regulate video gaming in Pennsylvania.[9] It provides, in pertinent part, as follows:

**(a) General powers.--**

(1) The [B]oard shall have general and sole regulatory authority over the conduct of video gaming or related activities as described in this part. The [B]oard shall ensure the integrity of the acquisition and operation of video gaming terminals, redemption terminals and associated equipment and shall have sole regulatory authority over every aspect of the conduct of video gaming.

. . . .

**(b) Specific powers.--**The [B]oard shall have the power and duty:

. . . .

**(2) At its discretion, to issue, approve, renew, revoke, suspend, condition or deny issuance or renewal of terminal operator licenses.**

. . . .

**(11)** To approve an application for or issue or renew a license, certificate, registration, permit or other authorization that may be required by the [B]oard, if **the [B]oard is satisfied that the person has demonstrated by clear and convincing evidence that the person is of good character, honesty and integrity whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest or the effective regulation and control of video**

---

[9] Section 3501 of the Video Gaming Act provides that "[n]o person may offer or otherwise make available for play in this Commonwealth a video gaming terminal unless the person is licensed under this part and according to regulations promulgated by the [B]oard under this part." 4 Pa. C.S. § 3501.

**gaming terminal operations or create or enhance the danger of unsuitable, unfair or illegal practices, methods and activities in the conduct of video gaming or the carrying on of the business and financial arrangements incidental thereto.**

. . . .

4 Pa. C.S. § 3301(a)(1), (b)(2), (11) (emphasis provided).[10] Section 3302(a)(1) of the Video Gaming Act, which establishes the Board's regulatory authority, provides, in pertinent part, as follows:

**(a) General rule.--**The [B]oard shall have the power and duty:

**(1) To deny, deny the renewal of, revoke, condition or suspend a license or permit provided for in this part if the [B]oard finds in its sole discretion that an applicant, licensee or permittee under this part or its officers, employees or agents have furnished false or misleading information to the [B]oard or failed to comply with the provisions of this part or the rules and regulations of the [B]oard and that it would be in the public interest to deny, deny the renewal of, revoke, condition or suspend the license or permit.**

. . . .

---

[10] Relatedly, Section 3502(b) of the Video Gaming Act, which governs terminal operator licenses, requires that terminal operator license applicants include in their applications "information, documentation and assurances as may be required to establish by clear and convincing evidence of the applicant's suitability, including good character, honesty and integrity." 4 Pa. C.S. § 3502(b). Section 3502(b) goes on to list the sources of such information, including "family, habits, character, reputation, criminal history background, business activities, financial affairs and business, [and] professional and personal associates . . . ." *Id.*

Section 3502(f) of the Video Gaming Act requires that the principals of terminal operator license applicants "obtain a license to meet the character requirements of [Section 3502] . . . ." 4 Pa. C.S. § 3502(f). Section 3504(c) in turn governs principal licenses and similarly provides that "the [B]oard may issue a principal license if the applicant has proven by clear and convincing evidence that the applicant is a person of good character, honesty and integrity and is eligible and suitable to be licensed as a principal." 4 Pa. C.S. § 3504(c).

14

4 Pa. C.S. § 3302(a)(1) (emphasis provided).

## B.     Analysis

Because we conclude that they are dispositive, we first address Petitioners' second, third, and fourth arguments, although in a modified order. In all three, Petitioners contend that the Board committed legal error and abused its discretion in denying the Applications.

### 1.     Character Suitability and the Public Interest

In their second and fourth arguments, which are related, Petitioners argue that the Board abused its discretion and committed legal error in concluding that (1) Petitioners failed to establish by clear and convincing evidence that they possess the requisite "good character, honesty and integrity" for the issuance of video gaming terminal licenses; and (2) issuing the requested licenses would be contrary to the public interest. We agree on both counts.

#### a.     Character

As set forth above, pursuant to Section 3301(b)(11) of the Video Gaming Act, the Board has the power to grant an application for a video gaming terminal license if it is satisfied that the applicant "has demonstrated by clear and convincing evidence that the person is of good character, honesty and integrity whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest . . . ." 4 Pa. C.S. § 3301(b)(11). *See also* 4 Pa. C.S. § 3301(b)(2) (the Board has the discretion to issue or deny issuance of terminal operator licenses). The Board also has the authority to deny a license if it finds that an applicant, or its officers, employees, or agents "have furnished false or misleading information to the [B]oard or failed to comply with the provisions of this part or the rules and regulations of the [B]oard *and* that it would be in the public interest to deny . . . the license . . . ." 4 Pa. C.S. § 3302(a)(1) (emphasis added). *See also* 4 Pa. C.S. § 3502(f) (principals of

15

potential operators also must obtain necessary licenses "to meet the character requirements of this section . . . "); 4 Pa. C.S. § 3504(c) ("[T]he [B]oard may issue a principal license if the applicant has proven by clear and convincing evidence that the applicant is a person of good character, honesty and integrity and is eligible and suitable to be licensed as a principal.").

We find these provisions of the Video Gaming Act to be clear and free from ambiguity, and, therefore, the Board's interpretation of them is entitled to no deference by this Court. *Crown Castle*. The Board's Corrected Adjudication includes a broad and detailed discussion of the Board's opinions of, and policy objectives regarding, the skill games industry. (Corrected Adjudication at 27-37.) The Board indicates that, overall, it believes that "gaming is best conducted in an environment that is strictly controlled and regulated" and that skill games are a "substantial public threat." *Id.* at 37. The Board then precipitously concludes that "the Brozzettis and Teitelbaum's continued involvement in this industry casts substantial doubt on whether they possess the good character and integrity required for a video gaming terminal principal license." *Id.*

The Board identifies in its Corrected Adjudication two overarching problems with the skill games industry: (1) it is entirely unregulated and, therefore, is not required to, and does not, provide adequate protections against underage and problem gambling; and (2) its existence causes a substantial decrease in tax revenue generated by the legalized gambling industry, from casinos particularly. The Board bases these conclusions on testimony given by Major Miller and Mr. Svitko before the Pennsylvania House of Representatives and other testimony and evidence submitted to the Board by casino representatives in unrelated proceedings. Even assuming that the issues identified by the Board correspond to some degree with the reality of the skill

16

games industry (which we do not, because we need not, address), the General Assembly has not made any legislative findings in this respect and has not enacted any legislation to date that attempts to remove the veritable scourge that the Board believes the skill games industry has left in its wake. Thus, the Board's findings in this regard remain its own policy determinations and nothing more.

More importantly, the Board does not indicate anywhere in its Corrected Adjudication how the problems it finds with the skill games industry denigrate and render unsuitable the "character, honesty and integrity" of *these specific Petitioners*. The Board nowhere in its Corrected Adjudication identifies any criminal convictions or investigations, tax-evading financial practices, connections with organized crime, false statements, or other nefarious or even allegedly nefarious conduct by any of the Petitioners. Nor does the Board indicate anywhere that any of the Petitioners refused to participate in, or provide information in association with, the extensive licensure investigations conducted by BIE. As Petitioners point out in their brief, the evidence suggests quite the contrary. *See* Petitioners' Br. at 30-32. The Board's findings and conclusions that Petitioners do not have the requisite character, integrity, and honesty for licensure is based exclusively on their association with the skill games industry and the problems the Board perceives to be associated with it. We find such association in itself to be wholly insufficient to support the Board's denial of the Applications. The Board's denunciation of Petitioners' character by mere association with this industry, which the Board simply does not like, cannot, without more, constitute a valid and reasonable exercise of the Board's discretion in considering and denying these Applications.[11]

---

[11] The Board noted, however, that video gaming terminal license applicants can redeem their character and suitability in the eyes of the Board if they make the "reasonable" decision to exit the **(Footnote continued on next page…)**

17

We therefore conclude that the Board erred and abused its discretion in denying the Applications based on its conclusion that Petitioners lack the requisite character for the issuance of the requested licenses.

b.      Public Interest

Petitioners next argue that the Board committed legal error and abused its discretion in concluding that granting the Applications would be contrary to the public interest.

As noted above, there are two relevant provisions of the Video Gaming Act that empower the Board to deny a video gaming terminal license application based on the Board's assessment of the public interest. First, Section 3301(b)(11) gives the Board the power to grant a license application if the Board concludes that the applicant has established, by clear and convincing evidence, that (1) it has the requisite good character, honesty, and integrity, *and* (2) its "prior activities, criminal record, if any, reputation, habits, and associations do not pose a threat to the public interest . . . ." 4 Pa. C.S. § 3301(b)(11). Thus, pursuant to Section 3301(b)(11), the Board may not grant (and therefore *must* deny) a license application if the applicant fails to satisfy either or both of those components with clear and convincing evidence.

Second, pursuant to Section 3302(a)(1), the Board affirmatively *may* deny a license application, in its sole discretion, if it concludes (1) that the applicant or its employees or agents have furnished false or misleading information to the Board or failed to comply with the provisions of the Video Gaming Act, *and* (2) that denying the license application would be in the public interest. 4 Pa. C.S. § 3302(a)(1).

---

skill games industry. (Corrected Adjudication at 38.) But, because the Brozzettis and Teitelbaum have made the unreasonable decision "to remain in the industry despite the vehement [] public opposition by government agencies and public officials who rightfully view [skill games] as a threat to the public," *id.*, they have foregone the high road to licensure.

18

Here, although it is not clear which of these two sections of the Video Gaming Act the Board relied upon in denying the Applications, neither supports the Board's findings. Under Section 3301(b)(11), we already have concluded that the Board erred and abused its discretion in concluding that Petitioners did not establish that they have the requisite character for licensure. Additionally, there is no evidence in the record, and the Board did not rely on any, establishing that any "prior activities" or "associations" of Petitioners tend to undermine the public interest. 4 Pa. C.S. § 3302(a)(1). Once again, although the Board made its policy directives clear in the Corrected Adjudication, there simply is no evidence suggesting that *these Petitioners'* activities or associations either threaten the public interest or will negatively impact the video gaming industry. Rather, the Board concluded that granting Petitioners' Applications would undermine the public interest because, in the Board's view, skill games themselves are contrary to the public interest. This, once again, is guilt-by-association with an industry that, whatever the Board's opinion, remains legal and legitimate in Pennsylvania.

The Board relies heavily on this Court's decision in *Sonic Services, Inc. v. Pennsylvania Gaming Control Board*, 219 A.3d 296 (Pa. Cmwlth. 2019), to argue that an applicant's questionable prior activities and business associations may serve as a legitimate basis to deny the issuance of a license. *Sonic Services* is easily distinguishable. In *Sonic Services*, the Board revoked the Gaming Service Provider Registration of Sonic Services, Inc. (Sonic) based on its principal's ties to organized crime. *Id.* We affirmed the Board's adjudication, concluding that substantial evidence garnered after a year-long investigation into Sonic's business associations supported the finding that Sonic had connections to organized crime. *Id.* at 303-04. We further

19

concluded that such connections would "tarnish the integrity of gaming to the public." *Id.* at 306.

Here, the Board's finding that granting the Applications would be contrary to the public interest is based on neither hard facts discovered during an extended investigation nor on substantial evidence (nay, any evidence) of Petitioners' associations with criminal activities. Rather, the Board's finding is based on its own policy objectives, which have not to date translated into any legislative findings in any statute criminalizing or otherwise regulating the skill games industry. Those policy objectives may or may not be accurate, but, in either case, Petitioners' associations with the skill games industry does not, as did the associations with organized crime in *Sonic Services*, significantly undermine the protection of the public or the integrity of licensed gaming. *Sonic Services*, 219 A.3d at 306.

Lastly, regarding Section 3302(a), there is no evidence that Petitioners either furnished false or misleading information to the Board or failed to comply with the provisions of the Video Gaming Act. 4 Pa. C.S. § 3302(a). Because the Board must, and did not, find that one of those prerequisites exists, it had no authority under Section 3302(a)(1) to deny the Applications. Accordingly, we conclude that the Board erred and abused its discretion in denying the Applications on the ground that granting them would be contrary to the public interest.

## 2. Illegal Gambling Devices

Petitioners next argue that the Board erred and abused its discretion in denying Better Bets' and the Brozzettis' license Applications on the basis that they operate illegal gambling devices in violation of Section 5513 of the Crimes Code, 18 Pa. C.S. § 5513. We agree.

20

The entirety of the Board's analysis on this issue comprises three sentences and is based exclusively on the parties' stipulation that Hugo, which is owned in part by the Brozzettis, operates the Diamond Choice Games that were determined to be illegal gambling devices in the *Luzerne County Case*. *See* Corrected Adjudication at 27; *see also id.* at 37 ("the suitability of the Brozzettis is further tarnished by their operation of two games—[the Diamond Choice Games]—that were determined to be illegal gambling devices by a Pennsylvania [c]ourt"). There are multiple deficiencies in the Board's findings in this regard that render it arbitrary and a manifest abuse of discretion. First, and once again, the Board made no relevant findings specifically with regard to the Brozzettis or Better Bets. Rather, the Board found that a *separate entity* (Hugo), which is owned *only in part* by the Brozzettis, at some point operated gaming devices in Luzerne County that were, in a civil forfeiture action initiated by the Commonwealth, determined to be illegal gambling devices under Section 5513.[12] Even assuming the illegality of the Diamond Choice Games, such attenuated connections between Hugo's business activities and the Brozzettis is insufficient to establish that they or Better Bets operate illegal gambling devices and, on that exclusive basis, are not suitable for video gaming terminal licensure.

Second, in making its findings, the Board relied on a single common pleas decision rendered in civil forfeiture litigation that involved only a single type of skill game. The Board simultaneously ignored several other common pleas' decisions that have held various types of skill games to *not be* illegal gambling devices under Section 5513. *See, e.g.*, *Beaver County Case*, R.R. at 963a-75a. Two of those decisions

___

[12] The Order in the *Luzerne County Case* merely granted the Commonwealth's "Motion for Order of Forfeiture" and declared the Diamond Choice Games to be forfeited to the Office of Attorney General. (R.R. at 976a.) Specific findings and analysis regarding those games' character or legality are not included in the record.

21

currently are on appeal and are scheduled to be argued seriately before an *en banc* panel of this Court in October 2023. *See In re: Three Pennsylvania Skill Amusement Devices, One Green Bank Bag Containing $525.00 in U.S. Currency, and Seven Receipts* (Pa. Cmwlth., No. 707 C.D. 2023); *In re: Four Pennsylvania Skill Amusement Devices and One Ticket Redemption Terminal Containing $18,692.00 in U.S. Currency* (Pa. Cmwlth., No. 761 C.D. 2023).

Finally, the Board's scant connection between the Brozzettis' and Better Bets' Applications and any criminal gaming activity is only exacerbated by the fact that the Board has no regulatory authority over skill games and is not empowered by the Video Gaming Act to conduct criminal investigations, prosecute criminal violations, or make findings of criminal culpability. *See POM of Pennsylvania, LLC v. Department of Revenue*, 221 A.3d 717, 736 (Pa. Cmwlth. 2019); 4 Pa. C.S. §§ 3904(a)(3), (7); 3904(b), (d).

In sum, we agree with Petitioners that the Board erred as a matter of law and manifestly abused its discretion (1) in concluding that the Brozzettis, through Hugo, operate illegal gambling devices, and on that basis, (2) denying the Brozzettis' and Better Bets' video gaming terminal license Applications.

### 3. Substantial Evidence

In their first issue, Petitioners argue that the Board's findings of fact and conclusions of law are not based on substantial evidence because they (1) are based on the opinion testimony of Major Miller and Mr. Svitko; and (2) are outside evidence and testimony the Board has received from casino representatives in other proceedings. Because we already have assumed the competency of this evidence and the propriety of the Board's consideration of it to conclude that the Board erred and abused its

discretion in denying the Applications, we need not consider these issues. In light of our conclusions above, they are moot.

### 4. Due Process

In their fifth issue, Petitioners challenge OEC's Denial Notices on due process grounds, arguing that they did not sufficiently advise Petitioners that denial would be recommended based, in part, on a finding that granting the Applications would be contrary to the public interest. This issue likewise is moot. We already have determined in any event that the Board erred and abused its discretion in concluding that granting the Applications would be contrary to the public interest.

### V. CONCLUSION

Because we conclude that the Board erred and abused its discretion in denying the Applications on the grounds set forth in its Corrected Adjudication, we reverse and remand to the Board with instructions to issue the requested licenses.

_____
PATRICIA A. McCULLOUGH, Judge

23

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Better Bets Ventures, LLC,                    :
                   Petitioner   :   **CASES CONSOLIDATED**
                                     :
           v.                            :
                                       :
Pennsylvania Gaming Control                   :
Board,                                        :
                   Respondent   :   No. 386 C.D. 2022
                                       :
Michael Brozzetti,                            :
                   Petitioner   :
                                       :
           v.                            :
                                       :
Pennsylvania Gaming Control                   :
Board,                                        :
                   Respondent   :   No. 387 C.D. 2022
                                       :
Frank Brozzetti,                              :
                   Petitioner   :
                                       :
           v.                            :
                                       :
Pennsylvania Gaming Control                   :
Board,                                        :
                   Respondent   :   No. 388 C.D. 2022
                                       :
Lendell Gaming, LLC,                          :
                   Petitioner   :
                                       :
           v.                            :
                                       :
Pennsylvania Gaming Control                   :
Board,                                        :
                   Respondent   :   No. 389 C.D. 2022
                                       :
Richard Teitelbaum,                           :
                   Petitioner   :
                                       :
           v.                            :
                                       :

Pennsylvania Gaming Control          :
Board,                               :
              Respondent          :    No. 390 C.D. 2022
                              :

## ***ORDER***

       AND NOW, this 12th day of  October, 2023, the March 23, 2022 orders, as amended on March 24, 2022, of the Pennsylvania Gaming Control Board (Board) are hereby REVERSED, and this matter is REMANDED to the Board with instructions to issue the requested licenses.

       Jurisdiction relinquished.

 

                             _____
                             PATRICIA A. McCULLOUGH, Judge